**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILL J. BAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 08 CV 5146** |
| | ) | |
| **v.** | ) | **Wayne R. Andersen** |
| | ) | **District Judge** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the court on the cross-motions for summary judgment of the

Plaintiff, Will J. Bailey ("Bailey" or "Plaintiff"), and the Defendant, Michael J. Astrue,

Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Fed. R. Civ. P.

56. For the reasons stated below, Defendant's motion [23] is granted, and Plaintiff's motion [17]

is denied.

## <u>BACKGROUND</u>

Plaintiff was receiving Social Security Supplemental Income ("SSI") benefits which were

cancelled effective January 1, 1997. He filed this case challenging the cancellation of those

benefits.

**I.      The Initial Application for Social Security Supplemental Income**

Plaintiff filed an application for SSI on January 3, 1995. (R. 55-56). He was seen on

March 28, 1995 by Orthopedist S. Sanghvi, M.D. and reported to Dr. Sanghvi that he had had

back pain "off and on" since an automobile crash in 1964. (R. 115). Bailey explained that he was

not able to "sit for more than half an hour or stand for more than half an hour in one place"

because of pain, that his "right leg goes numb if [he] walk[s] half to one block," that he "get[s] pain in [his] lower part of the back … every day and night," and that the "pain is sometimes affected by coughing and it is also worse in cold and damp weather." *Id*. Dr. Sanghvi noted that Plaintiff "walked without a limp," "could walk on heels and toes," and "could tandem walk as well as he could squat and kneel down." (R. 116). He further noted that Plaintiff "had full movement of the cervical spine," "no muscle spasm in the neck," "no obvious clinically demonstrable neurological deficit in the upper extremities," and "normal dexterity of the fingers of both hands." *Id*. Dr. Sanghvi also indicated that Plaintiff had "mild stoop, pelvic tilt, and mild dorsolumbar scolosis" and "tight hamstrings," but "no obvious clinically demonstrable neurological deficit in the lower extremities," "no muscle weakness in the lower limbs," and "no sensory deficit detected on testing for soft touch and with a pinwheel." *Id*. According to Dr. Sanghvi, Plaintiff's x-rays showed "advanced degenerative changes and also a degree of spondylolisthesis secondary to osteoarthritis." (R. 116-117).

On April 4, 1995, Plaintiff saw a psychiatrist, G. Sadasivan, M.D. (R. 118-121). Dr. Sadasivan noted that Plaintiff "abused alcohol, cocaine and heroin since he was 17 years old, and he was in three treatment programs in Chicago." (R. 118). He indicated that Plaintiff reported that he "quit using heroin and cocaine" and "is now on methodone but … still drinks alcohol." *Id*. Dr. Sadasivan also reported that Plaintiff "drinks alcohol by himself" and "said he still craves alcohol and crack cocaine." (R. 119) Dr. Sandasivan diagnosed Plaintiff with "Organic mood disorder; Organic hallucinosis; Alcohol abuse; History of crack cocaine and heroin abuse in the past." (R. 121).

On April 12, 1995, Dr. James T. Bianchin, M.D. prepared a Physical Residual Functional Capacity (RFC) Assessment. (R. 122-129). The purpose of an RFC assessment is to rate the

remaining functional capacity of a SSI claimant after taking into account the claimant's mental or physical disability. An RFC assessment can be prepared by an examining physician or by a non-examining physician who examines the claimant's medical records, as was the case here with Dr. Bianchin. (Pl.'s Mot. for Summ. J. or Remand at 13).

In his RFC assessment, Dr. Bianchin recommended the following "Exertional Limitations" for Plaintiff: occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday, and push and/or pull in an unlimited fashion other than the restrictions mentioned for lift and/or carry. (R. 123). In the section of the assessment requesting that Dr. Bianchin list the specific facts upon which his conclusions were based, he wrote: "52 y/o clt. alleges [illegible] low back pain due to [automobile accident] in 1964. Walked without a limp. Able to walk on heels and toes. [illegible] squat." *Id*. On the next page of the assessment, Dr. Bianchin continued, "Full ROM lumbar spine. 90° Flex. L leg ½" longer than right. No [illegible] to support a significant sensory, motor, or [illegible] deficiency. [illegible]." (R. 124). He noted that climbing of ramp/stairs/ladder/rope/scaffolds, stooping, and crouching should be limited to occasionally. *Id*. However, in the section below these postural limitations, he did not "fully describe" or "explain" his conclusions and he listed no "specific facts upon which [his] conclusions were based." *Id*. He noted that there were no recommended manipulative, visual, communicative, or environmental limitations. (R. 125, 126). Finally, Dr. Bianchin wrote, "[a]lthough radiological picture of [illegible] is recognized as 'abnormal'—Clt. [illegible] has findings consistent with limitations imposed by this RFC or better." (R. 128).

On April 17, 1995, Plaintiff was seen by a psychologist, Dr. Edward A. Czarnecki, Ph.D. (R. 134-142). Dr. Czarnecki diagnosed Plaintiff with having a Substance Addiction Disorder (R.

134, 140) evaluated under the category of Organic Mental Disorders (R. 134, 136, 140), and Personality Disorders (R. 134, 139, 140). Dr. Czarnecki noted that an RFC assessment was necessary as "a severe impairment is present which does not meet or equal a listed impairment." (R. 134).

The mental RFC Assessment was prepared that same day on April 17, 1995. (R. 130-133). It stated, "[t]his is 52 yo clmt has [history of] DAA. [illegible] finds [illegible] DAA [illegible] mood, [illegible] and memory [illegible]. Mental factors are impaired. Clmt uses methodone and still drinks which exacerbates 1202. Clmt. is extremely dependant on daughter. [illegible] DAA." (R. 132). DAA is an abbreviation for Drug Alcohol Abuse.

Plaintiff was approved for benefits based on a primary diagnosis of "Organic Brain Syndrome" and a secondary diagnosis of "Substance Addiction Disorder." (R. 57). The determination also stated, "DAA is material." *Id*. Plaintiff was informed in a letter dated May 24, 1995 that he was eligible for SSI benefits because he was "disabled" and also that "drug addiction and/or alcoholism [was] a contributing factor material to [his] disability." (R. 60). That same letter then explained that Plaintiff had to comply with certain treatment obligations, or "payments [would be] stopped." *Id*.

## II.     Denial of Benefits Effective January 1, 1997

Sometime during mid-1996, Plaintiff was notified that his benefits were to be terminated on January 1, 1997, pursuant to a change in the law, 42 U.S.C. § 423(d)(2)(C). That law, the Contract with America Advancement Act of 1996, was enacted on March 29, 1996 and ended benefits in cases where "alcoholism or drug addiction would … be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(3)(j).

Plaintiff disagreed with the determination to stop his benefits effective January 1, 1997 and claimed to be "disabled without considering drug addiction or alcoholism." (R. 63).

<u>The October 1996 Medical, Psychological, and Psychiatric Examinations</u>

On October 8, 1996, Plaintiff saw Dr. Raul A. Guevara, M.D. for a twenty-five minute Internal Medicine Evaluation for the Bureau of Disability Determination Services. (R. 143-149). Dr. Guevara noted that Plaintiff alleged disability due to a history of lower back pain. (R. 143). According to Dr. Guevara, Plaintiff gave the following description of his pain:

> …low back pain for approximately eight to twelve years. He complains of intermittent, sharp, shooting pain to the left buttock, radiating to the posterior thigh and just below the knee. Associated with this, is a "Charlie Horse" sensation and his legs occasionally giving way. He denies any urinary incontinence. … Currently, he complains of low back pain when walking approximately one block, or standing in line for about five or six minutes. Also, when sitting upright for five or six minutes, the pain would become more severe, during which time he would have to sit on his right or left buttock to relieve the symptoms.

*Id*. Dr. Guevara further noted that Plaintiff had "a history of hypertension" for which "he used to be on medication… but is not … at the present time." (R. 144). He indicated that Plaintiff "has been smoking two packs of cigarettes per day for approximately thirty-five years," has a thirty-five year history of daily alcohol intake (about "one to two quarts per day" of "usually wine"), and has been "shooting heroin for the past thirty-five years; about four times a week." *Id*. Dr. Guevara noted that Plaintiff reported last drinking "a pint of wine" and using "one bag of heroin" the morning of the exam. *Id*. Plaintiff's blood pressure at the exam was 140/80, and his breathing was "unlabored." *Id*. Dr. Guevara noted no abnormalities or problems with the Plaintiff's skin, head, eyes, vision, ears, nose, throat, neck, lungs, heart, abdomen, extremities, peripheral pulses, manual dexterity, neurological, reflexes, and sensory exam. (R. 145-146). With respect to Plaintiff's back, Dr. Guevara indicated that there was "[n]o deformity" in Plaintiff's "cervical, thoracic, or lumbar spine," "no limitation of motion of any spinal segment," and "no thoracic or

lumbosacral paraspinal muscle tenderness or spasm." (R. 145). Additionally, in regards to Plaintiff's range of motion, Dr. Guevara stated that Plaintiff had "no joint deformities, with full range of motion of the proximal and distal joints of the upper and lower extremities," and "no bone; joint, or muscle tenderness noted." (R. 146).

Dr. Guevara concluded, in regards to Plaintiff's alleged low back pain, that the examination "revealed no evidence of a lumbosacral radiculopathy." (R. 147). He noted that Plaintiff had a normal range of motion. (R. 149). Dr. Guevara then noted two other problems: "peripheral neuropathy; probably secondary to alcohol" and "history of alcohol and heroin dependence." (R. 147). He concluded his report by noting that "[a]t the end of the examination, the claimant was asked if all medical complaints were addressed today, and the claimant responded affirmatively." *Id*.

That same day (October 8, 1996), Plaintiff saw Psychologist Dr. Robert Casas, Ph.D. for a 65-minute appointment. (R. 150-153). Dr. Casas administered the Wechsler Adult Intelligence scale to Plaintiff. (R. 150). He received a verbal score of 69, performance score of 67, and a full scale score of 67—which would indicate that the Plaintiff functions within the mild range of mental retardation. (R. 150, 152). However, Dr. Casas explained that "the current test scores should not be considered reliable or valid," because Plaintiff appeared to "attempt[] to minimize his overall intellectual capacity," and because "he drank a significant amount of alcohol" and "used heroin … prior to the evaluation." (R. 152).

Dr. Casas noted that Plaintiff "appeared to have little motivation to respond to the limits of his ability during this evaluation." (R. 150) Furthermore,

> [Plaintiff] was observed initially to ambulate with a slow, deliberate, slightly hunched over gait when he first entered [Dr. Casas'] examining room. However, at the end of the 65-minute interview during which he sat, he arose and walked with a much more limber and fluid gait from [the] office.

*Id*. Dr. Casas also made the following observations:

> [Plaintiff] gave many nearly correct responses which is often found in individuals attempting to deliberate (sic.) dissimulate. He stated that his age was 55 when in fact it is 54. He correctly identified his birth date. He stated that the date was the 7th when in fact it was the 8th. He stated that the month was November when in fact it was October. He identified the year as 1995 though it is in fact 1996. He correctly identified the day of the week. He correctly identified the general time of day. When asked to state his home address, he stated it was 600 North Kenmore. The information forwarded to me … indicates that his address is 6000 North Kenmore. Similarly he has identified his apartment number as 301 … it's 103. The claimant states that he could not recall his telephone number. …

> When questioned about alcohol and drug use, the claimant stated that he had consumed approximately one-half to one pint of wine approximately three to four hours prior to the examination though he denied that he was intoxicated at the present time. No odor of alcohol was perceived.

> This claimant alleges chronic poly drug and alcohol abuse. The claimant states that he has been using heroin since the age of 17 and that he uses it intranasally. He denies that he injects this drug. He describes using heroin intranasally every two to three days since the age of 17 and asserts that it is a pattern that continues up to the present time. He states that his last use of heroin was yesterday. With regard to cocaine, he asserts a similar history. He states that he uses cocaine one to two times per week and that he has done so since age 17. In terms of his alcohol use, he states that it began as a "teenager", and that he drinks "every day". He states that he will drink one or more bottles of wine on a daily basis.

(R. 150-151).

The following day, on October 9, 1996, Plaintiff saw Dr. Christel Lembke, M.D. for a fifty-five minute Psychiatric Evaluation for the Bureau of Disability Determination Services. (R. 154-157). Dr. Lembke described Plaintiff as "reluctantly cooperative." (R. 154). She noted that "[w]hat was of diagnostic importance, however, was that most of his answers were almost

correct." *Id*. She also noted that Plaintiff reported that he had "been a heroin and occasional cocaine user most of his life," that he dropped out of a Methodone program in 1995, and that "his average daily use is three to four bags of heroin every two or three days and a bottle or two of wine." *Id*. Dr. Lembke concluded that Plaintiff had a "history of alcohol, cocaine and heroin abuse and probable dependence." (R. 156).

An RFC assessment was once again done for Plaintiff based on all medical records. (R. 158-165). This was done by Jose Gonzalez, M.D. on October 24, 1996. (R. 165). Dr. Gonzalez concluded that there were "[n]o functional physical impairments affecting work related activities." (R. 158). He did not make any entries in any portion of the assessment about any limitations to be placed on Plaintiff. Dr. Gonzalez noted Plaintiff's complaints about lower back pain and referred back to Dr. Guevara's findings from earlier that month that Plaintiff experienced a normal range of motion in his joints, was able to walk on heels and toes, and had a normal gait. (R. 165).

In contrast with Dr. Bianchin's April 12, 1995 RFC assessment from a year and a half earlier (R. 122-129), Dr. Gonzalez made no mention to the 1995 x-rays, which showed advanced degenerative disk changes and spondylolisthesis. (R. 124, 128, 165).

Also in late October 1996, Dr. David Brister, Ph.D. reviewed the record and filled out a mental RFC assessment. (R. 166-169; 170-178). Dr. Brister concluded that Plaintiff's substance abuse rendered him incapable of performing "even [a] simple job adequately for full time [illegible] employment," that "with abstinence, there would appear to be no remaining psychopathy to impair his ability to do SGA [substantial gainful activity]," and that "DAA is material." (R. 168).

### III.     The Hearing Before the Disability Hearing Officer

A hearing was held on November 22, 1996. (R. 64, 71). The disability hearing officer summarized Plaintiff's testimony as follows:

> At the hearing the claimant testified to be disabled because of arthritis in the right side of his back that caused him to be in constant pain and high blood pressure which causes him to have shortness of breath. He also indicated that he was unable to bend over without a wall to lean, otherwise he would have to get on one knee because of the severeness (sic.) of the arthritis in his back. The claimant testified that he is unable to do any kind of household responsibilities secondary to his back pain. He also alleged that he has difficulty with understanding, remembering, and concentration.

(R. 65; *see also* R. 73). On December 5, 1996, the disability hearing officer published a decision finding that Plaintiff was not disabled. (R. 70). He noted that at the hearing, Plaintiff "was able to ambulate without difficulty," "his breathing was non-labored," "[t]here were no noticeable signs of any physical limitations," "[h]is comprehension was adequate," "he was able to speak clearly though with a soft and flat voice," and "[h]is recall and concentration was adequate." (R. 66). The hearing officer also included in his summary that Plaintiff had an "invalid" psychological consultative examination performed by Robert Casas, Ph.D. on October 8, 1996, and that the evidence indicated that Plaintiff "had been using alcohol and drugs over the 24 hours before examination." *Id*. The disability hearing officer also included in his summary that Plaintiff had had a psychiatric consultative examination performed by Christel Lembke, M.D. on October 10, 1996, and that the "evidence from this evaluation indicates that the claimant has a history of alcohol, cocaine and heron (sic.) abuse with probable dependence." *Id*. His conclusion was that "[t]he claimant would not be found disabled in the absence of substance abuse" (R. 70), and therefore his benefits would end.

**IV.     The Hearing Before Administrative Law Judge Jonas**

Plaintiff timely requested a hearing before an administrative law judge ("ALJ"), stating that he disagreed with the determination made by the disability hearing officer because he suffered "chest pains, back pain, shorteness (sic.) of breath, [and] stiffed (sic.) limbs." (R. 87). In his application for a hearing before an ALJ on February 21, 1997, Plaintiff claimed that each day he took 4 or 5 Tylenol 500s for pain and 4 or 5 Actifed-Cs for breathing. (R. 105).

On April 17, 1998, Plaintiff appeared before ALJ Alan Jonas. (R. 38). Plaintiff appeared in person and was represented by Raymond Dudley, a non-attorney. *Id*. Dudley argued that Plaintiff should receive benefits because of his limited education, because his back pain makes it impossible for him to walk even short distances, and because he has difficulty understanding and remembering. *Id*. ALJ Jonas asked Dudley if he had reviewed the documents in Plaintiff's folder that would form the basis of the decision, and Dudley responded he had looked at "some." *Id*. The documents were entered into evidence. *Id*.

At that hearing, Plaintiff claimed that he "never did" use alcohol, and that he last used cocaine or heroin "over a year and a half… almost two years" before. (R. 41). ALJ Jonas asked Plaintiff about a report from Dr. Guevara (though the transcript incorrectly refers to him as Dr. Dava), who saw Plaintiff approximately a year and a half before in October 1996 and noted that Plaintiff reported snorting one bag of heroin the morning of the appointment. (R. 47). Plaintiff responded that he "[didn't] remember telling him that." *Id*. ALJ Jonas also asked Plaintiff about the report from Dr. Casas from the visit the same day in October 1996 that stated that Plaintiff reported having "consumed approximately one half to one pint of wine three to four hours prior to the examination." *Id*. Plaintiff reiterated that he did not drink and stated that he did not understand why that would be in Dr. Casas's report. *Id*. Plaintiff also claimed that he had not

seen any doctor for his back problems "because I don't have no medical card. I don't have no kind of medical." *Id*. When asked to describe his back problems, Plaintiff claimed that he couldn't "sit too long [or] … stand too long" and that his left leg would go "numb … and … feel like it's on fire" and "[c]ollapse out from under [him]" (R. 43-44). Plaintiff claimed that he could not "sleep on [his] side or back" because sleeping on his back "hurts too bad." (R. 45). When asked about Dr. Guevara's findings that "he couldn't find anything wrong," Plaintiff claimed that "the only thing that [Dr. Guevara] did was just get the little helmet and hit me on my knee and just see how far [he] could … raise up my leg and that's all." (R. 44).

## V.     Administrative Law Judge Jonas's Determination Upholding the Cessation of Benefits

In his May 20, 1998 decision, ALJ Jonas explained the Social Security Regulations that provide a sequential five-part test for determining whether a claimant is disabled. (R. 19-30 (citing 20 C.F.R. §§ 404.1520, 416.920 (1999))). The Commissioner must consider (1) whether the claimant is presently unemployed, (2) whether the claimant has a severe impairment or combination of impairments, (3) whether the claimant's impairment meets or equals any impairment listed in the Social Security Regulations as being so severe as to preclude substantial gainful activity, (4) whether the claimant is unable to perform his past relevant work, and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id*.; *see also Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer at either step three or step five requires a finding of disability, whereas a negative answer at any step (other than step three) precludes a finding of disability. The claimant bears the burden of proof at steps one through four; the burden shifts to the Commissioner at step five. *Id*.

When a claimant for disability benefits cannot be found disabled based on medical considerations alone, the Social Security Administration has established the Medical-Vocational Guidelines (the "Grid") in order to assess a claimant's ability to engage in substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1999). The Commissioner's analysis at step five typically involves an evaluation of the claimant's residual functional capacity (RFC) to perform a particular category of work (*i.e.,* sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *Id.*

ALJ Jonas stated that the "specific issue to be decided is whether drug addiction and/or alcoholism [was] a contributing factor material to [the claimant's] disability." (R. 20.) ALJ Jonas explained that alcohol and drug use is considered "material" pursuant to 20 C.F.R. 416.935(b)(2)(i) if the claimant would not be disabled if he or she ceased using drugs and alcohol. *Id.* ALJ Jonas noted that Plaintiff had appealed the materiality finding on substance abuse on July 30, 1996, alleging disability due to chest pains, back pains, shortness of breath, and stiff limbs. *Id.* ALJ Jonas then began the five-step analysis outlined above to determine whether Plaintiff was disabled, considering all of the evidence, including the evidence of Plaintiff's substance abuse. *Id.*

First, ALJ Jonas found that there was no evidence that Plaintiff was currently engaged in substantial gainful activity and, therefore, no reason for denying his request at the first step. (R. 20-21.) ALJ Jonas then determined at steps 2 and 3 that Plaintiff's impairments were "severe," as they significantly limited his ability to perform basic work activities, but they did not meet the requirements or equal the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (R. 21).

Before reaching Step 4 of the analysis, ALJ Jonas set forth his findings regarding Plaintiff's residual functional capacity. *Id*. ALJ Jonas found that Plaintiff's disabilities did not prevent work-related activities except that Plaintiff's substance abuse condition would "seriously interfere with effective concentration, the ability to maintain a productive pace, and appropriate interaction with co-workers and supervisors, and causes a substantial loss of the ability to understand, remember, and carry out even simple instructions." *Id*.

ALJ Jonas then discussed the bases for his finding. *Id*. First, ALJ Jonas noted that the medical evidence in the record showed abnormal findings that dealt primarily with Plaintiff's substance abuse disorder. *Id*. ALJ Jonas referred specifically to Dr. Sadasivan's psychiatric evaluation on April 30, 1995 when Plaintiff was diagnosed with organic mood disorder, organic hallucinosis, alcohol abuse, and a history of crack cocaine and heroin abuse. (R. 21 (citing to R. 118-21)). This psychiatric evaluation also reported that Plaintiff continued to drink alcohol by himself, craved cocaine, experienced depression and crying spells, heard voices, and experienced delusions of persecution. *Id*. (citing to R. 120). ALJ Jonas also discussed the October 8, 1996 examination by Dr. Guevara in which Plaintiff reported drinking one pint of wine and snorting one bag of heroin the morning of the exam. *Id*. (citing to R. 144). He noted that psychological and psychiatric findings from October 8 and 9, 1996 included limited responsiveness, daily drinking, continued heroin and cocaine abuse, and probable substance dependence. (R. 22 (citing to R. 150-57)). ALJ Jonas further stated that Plaintiff's examiners determined that he was incapable of managing his funds due to his substance abuse. *Id*. (citing to R. 152, 156).

ALJ Jonas then opined that the medical evidence demonstrated a substantial loss of the ability to concentrate, understand, remember, and carry out simple instructions, and that consideration of the factors described in 20 C.F.R. 416.929(c) and Social Security Ruling 96-7p

supported his finding regarding Plaintiff's RFC. *Id*. ALJ Jonas noted that Plaintiff reported at times that he no longer used drugs and alcohol, but that he also reported to medical examiners that he continued to use drugs and alcohol. *Id*. ALJ Jonas further stated that he relied in large part on the opinions of consulting physicians from the State Disability Determination Services, which ordinarily bear less weight, than the opinions of treating physicians, but he stated that their opinions deserve some weight along with other evidence, to reach the conclusion that Plaintiff is not disabled but for his substance abuse problem. *Id*.

ALJ Jonas then proceeded to consider Plaintiff's argument that he is disabled, absent substance addiction, due to his back problems, high blood pressure, and mental problems. *Id*. ALJ Jonas determined at Step 2 and 3 of the analysis that Plaintiff's impairments are severe, but that they do not meet the requirements or equal the level of severity contemplated in Appendix 1 to Subpart P. Regulation No. 4. (R. 22-23, 27-28). ALJ Jonas then concluded that the record, including Plaintiff's complaints of disabling pain, supported an RFC finding that Plaintiff was capable of performing the full range of unskilled work. (R. 23).

Before discussing the medical evidence in support of that residual functional capacity, ALJ Jonas summarized Plaintiff's alleged symptoms, impairments, and limitations. *Id*. ALJ Jonas noted that Plaintiff claimed to have been disabled since February 20, 1986, due to arthritis on the right side of his back, high blood pressure, and memory problems. *Id*. ALJ Jonas considered Plaintiff's reports that he sleeps on his stomach to alleviate his back pain, that his left leg frequently goes numb, his legs collapse, and he cannot sit, stand or walk for very long. *Id*. ALJ Jonas also referred to the July 30, 1996 Disability Report, in which Plaintiff reported that he essentially does nothing at all on a daily basis. (R. 23 (citing to R. 91)).

ALJ Jonas then detailed the medical evidence in support of his finding that with Plaintiff's RFC he is able to perform even heavy unskilled labor. First, ALJ Jonas stated that, despite Plaintiff's complaints of constant, debilitating back pain, the medical evidence showed very little pathology. (R. 24). ALJ Jonas considered that the 1995 x-rays showed advanced degenerative changes and spondylolisthesis, but stated that the internal medicine consultative physical examination from March 1995 showed full range of motion of the cervical spine, no spasm, no neurological deficits of either the upper or lower extremities, and normal finger dexterity bilaterally. (R. 24, 116). He also noted that the examination showed no muscle weakness of the lower limbs and no sensory deficits, and that the examiner had reported that Plaintiff had no limp, was able to heel/toe walk, tandem walk, kneel, and squat. *Id*. Similarly, ALJ Jonas commented that the only abnormalities reported at Plaintiff's October 1996 evaluation were absent patella and ankle jerks bilaterally and reduced sensation to pinprick in the lower extremities. (R. 24, (citing R. 116, 146)). He further stated that the second examiner had reported that Plaintiff's gait was steady and he was able to walk without assistance. *Id*. The October 1996 examination also showed that Plaintiff experienced a full range of motion, no joint deformities, no tenderness, normal manual dexterity, normal strength in both his upper and lower extremities, and no evidence of the nerve irritation caused by damage to the discs between the vertebrae (lumbosacral radiculopathy). *Id*.

ALJ Jonas then considered the medical evidence supporting Plaintiff's complaints of disabling high blood pressure. He noted that although both the March 1995 and the October 1996 medical examinations showed that Plaintiff experienced elevated blood pressure, neither examination reported any abnormalities in pulse or breathing. *Id*.

Finally, ALJ Jonas considered the evidence surrounding Plaintiff's complaints of mental incompetence. ALJ Jonas noted that the psychiatric and psychological examinations performed in March 1995 and October 1996 indicated that Plaintiff was depressed with only fair contact with reality, but that he was oriented to time, person, and place. *Id.* ALJ Jonas also commented that Dr. Casas, who administered the test, disregarded Plaintiff's full scale IQ score of 67 as invalid due to Plaintiff's lack of effort and possible attempts to minimize his own capacity and, instead, opined that his IQ was likely 80 or above. (R. 24-25). In addition, ALJ Jonas noted that during the October 1996 psychiatric examination, Dr. Casas indicated that although Plaintiff appeared depressed and his stream of conversation was very poor, his speech was well articulated, his conversation was goal-directed, and his responses to questioning were almost entirely correct. (R. 25). Also, ALJ Jonas noted that Dr. Casas made only one psychiatric diagnosis, which was a history of alcohol, cocaine, and heroin abuse and probable substance dependence. *Id.*

ALJ Jonas then included a detailed discussion of his reasons for finding that Plaintiff's subjective complaints of disabling conditions were not credible. First, ALJ Jonas noted that a major factor in discrediting Plaintiff's allegations of disabling conditions was the lack of a treatment history consistent with his complaints. *Id.* Specifically, the record contained no evidence of treatment for back problems beyond Plaintiff's own assertions of treatment in the past. *Id.* Second, ALJ Jonas focused on the fact that at times Plaintiff stated that he was taking medication for back pain and breathing problems (R. 105), but at other times reported taking no medications (R. 25 (citing to R. 118)). Third, ALJ Jonas determined that Plaintiff's reports of his extremely limited daily activities were incapable of verification and, even if true, might not be attributable to his alleged disabling conditions given the weak medical evidence supporting his

complaints. (R. 26). Finally, ALJ Jonas stated that Plaintiff's generally unpersuasive appearance and demeanor at his hearing, along with the other above-mentioned factors, contributed substantially to the ALJ's credibility finding. *Id*.

Thus concluding that the medical evidence and credibility determinations supported the finding that Plaintiff was capable of performing the full range of unskilled work, ALJ Jonas continued to Step 4 of the disability determination analysis. (R. 26). Because Plaintiff had not worked in the past 15 years, ALJ Jonas found that he was not capable under Step 4 of returning to any past relevant work. *Id*. ALJ Jonas then went on to Step 5, which requires the Commissioner to show that there are jobs existing in significant numbers in the national economy that Plaintiff can perform consistent with his age, education, work experience, and functional limitations. *Id*. ALJ Jonas found that Plaintiff was an individual of an advanced age with a marginal (less than 7th grade) education who had not acquired any skills in past relevant work that are transferable to other skilled or semi-skilled jobs. *Id*.

ALJ Jonas observed that if Plaintiff could perform the full range of all work, the Grid would lead to a finding of "not disabled." However, ALJ Jonas observed, Plaintiff's residual functional limitations "do not exactly coincide with those considered under the Medical-Vocational Rules; thus, none of the rules can be applied to reach a result in this case." (R. 27 (citation omitted)). ALJ Jonas concluded that Plaintiff's additional limitations were "only slight" and did not significantly erode the base of available jobs. Accordingly, applying the Grid as "a framework for decision-making," ALJ Jonas determined that significant numbers of unskilled jobs exist in the economy for Plaintiff to perform. *Id*.

In the conclusion of this ten page May 20, 1998 decision, ALJ Jonas upheld the cessation of Plaintiff's benefits. (R. 19-30). Plaintiff filed a Request for Review of Hearing Decision/Order

on May 27, 1998. (R. 14-15). The Appeals Council denied that Request on July 6, 2000. (R. 5-6). Meanwhile Plaintiff filed a subsequent claim and was found disabled due to a first diagnosis of "Mood Disorders" and a secondary diagnosis of "Personality Disorders" as of July 31, 2000. (R. 213, 281, 311-312).

## VI.    The Decision to Remand by Magistrate Judge Brown

On February 12, 2001, the SSI Appeals Council granted Plaintiff an extension of time to file an civil action (R. 3), and Plaintiff subsequently brought an action in federal district court before Magistrate Judge Geraldine Brown pursuant to 42 U.S.C. 405(g) for judicial review of the decision upholding the cessation of his benefits. Plaintiff raised two primary challenges to the ALJ's finding that he was not disabled absent substance abuse. First, Plaintiff argued that the ALJ erred in finding that he is capable of performing the full range of unskilled work, which includes heavy work. *Bailey v. Barnhart*, 2002 U.S. Dist. LEXIS 17094, *34 (N.D. Ill. 2002). Second, Plaintiff contended that ALJ Jonas erred by not developing the record fully, especially given that Plaintiff was not represented by an attorney. In this regard, Plaintiff faulted ALJ Jonas for failing to advise him of his right to an attorney, failing to obtain more recent x-rays, failing to require the examining physicians to fill out the SSA's RFC evaluation form, and conducting a hearing so brief that the transcript was only eleven pages. *Id*. Plaintiff moved for a summary judgment order or remand. *Id*.

Magistrate Judge Brown identified the "major issue [as] whether and for what reason the ALJ rejected Dr. Bianchin's report, which relied on the 1995 x-rays in assessing Plaintiff's residual functional capacity at medium work 'or better.'" *Id*. at *38. Magistrate Judge Brown further noted that it was "unclear from the ALJ's decision how much, if any, weight he accorded Dr. Bianchin's [RFC] determination, because the determination [was] not mentioned at all in the

written decision." *Id*. (citing 20 C.F.R. 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.")). The court also noted that ALJ Jonas "failed to articulate his reasoning for resolving the apparent conflict between Dr. Bianchin's and Dr. Gonzalez's respective residual functional capacity determinations in favor of Dr. Gonzalez's unrestricted [RFC] determination." *Id*. at *39.

Turning next to the issue of the fully developed record, the court noted that the "Commissioner admit[ed] that the ALJ failed to obtain a valid waiver of that right to counsel before proceeding with the hearing." *Id*. at *41. The court then noted that because the "claimant proceed[ed] *pro se,* the duty to develop a full record is heightened, and requires that the ALJ "scrupulously and conscientiously [have] probe[d] into, inquire[d] of, and explore[d] for all the relevant facts." *Id*. (citing *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991)). The Court held that "[a]t a minimum, on remand the ALJ should make every effort to clarify Dr. Bianchin's [RFC] assessment, and to require that all examining and consultative examiners review the relevant radiological evidence and offer opinions about Plaintiff's capacity to perform medium or heavy work activities." *Id*. at *44-45.

Thus Plaintiff's motion for summary judgment was granted "because the ALJ has not provided sufficient articulation of his reasons for apparently rejecting Dr. Bianchin's [RFC] determination or for weighing the medical evidence to conclude that it supported a finding that Plaintiff was capable of the full range of unskilled work" *Id*. at *39, and because the "significant ambiguity regarding Dr. Bianchin's [RFC] assessment and the weight accorded to the 1995 x-rays showing advanced degenerative disk changes and spondylolisthesis demonstrate the ALJ's failure to develop a full and fair record in this case." *Id*. at *45. Consistent with that decision, the case was then remanded to the Commissioner on September 12, 2002. (R. 213). The Appeals

Council, recognizing that Plaintiff had since been recognized as disabled as of July 31, 2000, remanded the case on January 27, 2004 to the ALJ for further consideration of the period prior to July 31, 2000 and for further proceedings consistent with the order of the court. (R. 249-250).

**VII.    The January 8, 2007 Supplemental Remand Hearing**

After being rescheduled multiple times (R. 256, 268), the remand hearing occurred before ALJ Alan Jonas on January 8, 2007 (R. 213, 291, 293, 305, 308). Plaintiff was present and represented by an attorney. (R. 213) Dr. David W. Cugell, M.D. testified at the hearing as an expert witness in order to share his opinion as to whether Plaintiff was disabled during the relevant time period. *Id*.

ALJ Jonas began the hearing by briefly describing the procedural history and noting that there was no new medical evidence from the relevant time period of June 24, 1997 to July 31, 2000, when Plaintiff was granted benefits. (R. 311-312).

ALJ Jonas then questioned Dr. Cugell, the medical expert. (R. 312). Dr. Cugell graduated in 1947 from State University of New York (SUNY) Downstate College of Medicine and is board certified in the areas of internal medicine and pulmonary distress. (R. 306). He is affiliated with Northwestern Memorial Hospital. *Id*. ALJ Jonas directed Dr. Cugell's attention to Dr. Sanghvi's report referring to x-rays of the Plaintiff's spine and containing the conclusion that "[t]he x-rays have shown advanced degenerative change and also a degree of spondylolisthesis secondary to asteorarthritis." (R. 313). ALJ Jonas then clarified that the actual x-rays and the x-ray report are not part of the record and that the only reference to "advanced degenerative changes and also a degree of spondylolisthesis secondary to asteorarthritis" is the reference to the x-rays by Dr. Sanghvi. (R. 314). Dr. Cugell then reported that he also reviewed other records that are relevant to Plaintiff's physical RFC, particularly the records on the range of motion of the

Plaintiff's lumbar spine that he found "highly relevant." *Id*. ALJ Jonas then gave Dr. Cugell the opportunity to ask Plaintiff questions.

Plaintiff reported that he had never "had any special treatment because of [his] back trouble" "more than pain pill (sic.)." (R. 315). He claimed that he had had x-rays of his back done in the last four or five years "at the county" and "at Providence," and that after those x-rays he was given "some more pain pill (sic.)." (R. 315-316). Plaintiff then reported that his arms "get numb when [he] wakes up in the morning" and that he "can't use it, … until it seem like [he] work[s] with it and then it … get (sic.) inflamed." (R. 316). Dr. Cugell next asked to see Plaintiff's hands, and Plaintiff showed them. *Id*. Plaintiff then reported that he took "[o]ne aspirin a day" to "keep down strokes." *Id*. He reported that he took something for his backache: "sometimes it will be Tylenol" but also that he had been given "something different." (R. 317).

ALJ Jonas then asked Dr. Cugell whether he had an "opinion as to whether or not the claimant had any medically determinable impairment … [during] this period of time, June 24th, 1997 up to approximately July or August of the year 2000." *Id*. Dr. Cugell responded as follows:

> … [Plaintiff] is alleged to have had multiple medical problems including asthma, high blood pressure, which we've not discussed, but the back problem is… repeatedly mentioned. On the other hand, he … apparently has a normal range of motion and has radiologic findings that are fairly commonplace … which I do not believe reach the degree of severity that would qualify him as being significantly impaired. He had the straight leg raising to 90 degrees, and the orthopedic assessment is based entirely on [the report of Dr. Sanghvi], and the conclusions are based entirely on a… radiology report which is not consistent with a physical examination. What the neurological deficit that he mentions is he doesn't state. No sensory deficit, and straight leg raising is the standard test of significant back troubles.

(R. 318). Dr. Cugell then concluded that, based on the clinical evaluation of what the Plaintiff could do and what was found during his examination, he had a non-severe impairment. *Id*.

Plaintiff's attorney, Marcie Goldbloom, then asked questions of Dr. Cugell, establishing that he did not have a specialty in orthopedics. *Id*. She then went on to question Dr. Cugell about

the basis of his opinion. (R. 318-321). Plaintiff's attorney made repeated objections to the qualifications of Dr. Cugell and asked for a supplemental hearing with an orthopedic specialist. (R. 321, 322, 329, 331).

ALJ Jonas again questioned Dr. Cugell. Dr. Cugell stated that he "would seek help [if] of the severity of the radiologic report did not match the clinical findings in the case." (R. 332). However, he agreed that an orthopedist would not be able to examine the claimant if the examination was 11 years before. *Id*. Dr. Cugell also agreed that in his opinion "an individual complaining of back pain but who … doesn't have positive straight leg raising … that patient probably doesn't have a severe back problem" (R. 333), and that that set of facts would lead him to believe "that the backache was not due to spinal injury" or "arthritic, degenerative arthritic changes" (R. 333, 334). Finally Dr Cugell testified that it was inconsistent for an individual with back problems to both get relief from lying down but to also have pain wake him up from sleeping. (R. 336-338).

The hearing was then adjourned with Plaintiff's attorney arguing that, based on Dr. Sanghvi's report interpreting the x-rays, there was a conflict between Dr. Cugell's opinion and Dr. Bianchin's RFC assessment (R. 338-339), that the subjective reports of pain by Plaintiff must be considered, that it is therefore reasonable to find that "such an individual would not have been able to sustain work that required him to… lift and carry up to 100 pounds for up to one-third of the work day," and "that as a result grid rule 20310 directs the find[ing] he's been disabled since his 55th birthday." (R. 339).

## VIII.   Administrative Law Judge Jonas's Remand Determination Upholding the Cessation of Benefits

Plaintiff's claim was again denied, in an opinion by ALJ Jonas dated February 16, 2007. (R. 213-218). In that opinion, ALJ Jonas identified the issue as "whether the claimant was

disabled under section 1614(a)(3)(A) of the Social Security Act at any time prior to July 31, 2000." (R. 213). ALJ Jonas then began his discussion under the five-step analysis required in order to determine whether Plaintiff was disabled.

First, ALJ Jonas stated that he found that Plaintiff "has not engaged in substantial gainful activity since June 24, 1997." (R. 215). Therefore, there was no reason for denying his request at the first step. Turning to the next steps, ALJ Jonas stated that "[p]rior to July 31, 2000 the claimant had the following severe impairments: substance abuse disorder and degenerative disc disease in the lumbar spine," but that these "impairments or combination of impairments" did not "meet or medically equal[] one of the listing impairments." *Id*. He noted that "[f]rom an orthopedic standpoint [Plaintiff] did not manifest the significant degree of ambulatory dysfunction … nor the level of pathology required," nor was his substance abuse disorder "severe enough to satisfy the listing criteria." (R. 216). He noted that further discussion of the substance abuse disorder was unnecessary "as it was considered thoroughly at the time of the initial hearing and the District Court made no adverse reference to the ultimate conclusion concerning the 'materiality' of the abuse vis-a-vis a finding of disability." *Id*.

Turning to Step 4 of the analysis, the ALJ set forth his findings that Plaintiff "had the residual functional capacity to lift 100 pounds occasionally and 50 pounds frequently; and to sit, stand, and/or walk for at least six hours in an eight hour day." *Id*. The ALJ then discussed the basis for this finding. As part of this basis, he expressly incorporated the findings made in his earlier May 20, 1998 decision. *Id*. He summarized the evaluation by Dr. Sanghvi from March 28, 1995 and Dr. Sanghvi's discussion of the x-ray report. *Id*. He then summarized Dr. Cugell's testimony at the supplemental hearing, the exam by Dr. Guevara, and the determination of Dr. Gonzalez that Plaintiff had no physical functional limitations. (R. 216, 217).

ALJ Jonas then turned to address the conflicting medical opinions as to what Plaintiff's RFC was during the relevant time period. (R. 217). In response to the District Court criticism that he had not sufficiently articulated the reason for rejecting the assessment of Dr. Bianchin in his earlier decision, ALJ Jonas explicitly noted:

> … [T]he reference x-ray report is not in claimant's administrative file and, more importantly, as noted by Dr. Cugell, the findings of the two doctors who had the opportunity to physically evaluate the claimant (namely, orthopedist Sanghvi and internist Guevara) do not support Dr. Bainchin's conclusion. Furthermore, Dr. Bianchin's assessment preceded Dr. Guevara's examination of the claimant by approximately eighteen months. Indeed, according to Dr. Cugell, based on these clinical evaluations, claimant did not even manifest a "severe" impairment as defined in the Regulations.

*Id*.

Then turning to the final step of the analysis, ALJ Jonas found that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed prior to July 31, 2000…absent the limitations associated with substance abuse." (R. 218). ALJ Jonas then concluded by determining that Plaintiff was not disabled and therefore did not qualify for benefits during the relevant time period. *Id*.

Plaintiff filed exceptions to the denial with the SSI Appeals Council (R. 201), but the Council denied review on June 7, 2008, thus rendering ALJ Jonas's decision final (R. 198).

## IX. Procedural History Before This Court

It is the February 16, 2007 final decision from the Social Security Administration denying disability benefits that Plaintiff seeks now to be reviewed in his September 9, 2008 complaint. Plaintiff filed a motion for summary judgment or remand on August 3, 2009, and Defendant filed a cross-motion for summary judgment on October 5, 2009.

Plaintiff argues that the Commissioner's final decision incorrectly concludes that Plaintiff was not disabled, and thus did not qualify for disability benefits during the contested period.

Plaintiff requests this court: (1) either reverse and set aside the Commissioner's final decision denying benefits for the period between January 3, 1995 and July 30, 2000, or remand the case for further proceedings consistent with the Commissioner's regulations and case law; and (2) award attorney's fees pursuant to the Equal Access to Justice Act if Plaintiff is the prevailing party, and as part of its judgment in accordance with 42 U.S.C. § 406(b). Defendant argues the Commissioner's final ruling denying Plaintiff disability benefits is supported by substantial evidence and, therefore, should be upheld.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate where there "is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court should find in favor of the moving party where the non-moving party has "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id*.

Judicial review of a final determination by the Commissioner of Social Security must take "the findings of the Commissioner…as to any fact, if supported by substantial evidence, [to] be conclusive." 42 U.S.C. § 405(g). The "substantial evidence" standard has been interpreted to mean "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. A reviewing court may not "decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). In addition to a lack of evidence, a reversal

of the Commissioner's decision is also warranted where there has been an error of law. *Waite v. Bowen*, 819 F.2d 1356, 1360 (7th Cir. 1987).

## ANALYSIS

Plaintiff contends that the Commissioner erred in denying his claim because the Commissioner incorrectly determined that Plaintiff did not suffer from a disability. Specifically, Plaintiff challenges the Commissioner's final determination on two grounds, claiming (1) that the ALJ failed to assess the Plaintiff's credibility, which was an error of law, and (2) that the ALJ failed in making his conclusion that Plaintiff had an RFC such that he could perform heavy work.

Defendant contends that there are three issues before the court and urges the court to find that: (1) there was substantial evidence supporting the ALJ's decision that Plaintiff was not disabled during the relevant three-year period, (2) the ALJ did not commit error in rejecting Plaintiff's subjective allegations, and (3) the ALJ did not clearly err by favoring more recent medical opinions over the RFC of Dr. Bianchin.

The issues raised by the parties can be adequately addressed by focusing on two broader issues: (1) Did the ALJ commit an error of law?, and (2) Were the findings of the ALJ supported by substantial evidence?

## I. The ALJ Did Not Commit an Error of Law in His Assessment of Plaintiff's Credibility and Subjective Complaints of Pain

Plaintiff argues that the ALJ's determination failed to include an assessment of Plaintiff's credibility. A ruling that includes evaluations of symptoms, including pain, "must contain specific reasons for the finding on credibility." Social Security Ruling ("SSR") 96-7p. Failure to do so constitutes an error of law mandating remand. *See Schmoll v. Harris*, 636 F.3d 1146, 1150

(7th Cir. 1980) ("When the Secretary or the district court commits an error of law, reversal is, of course, warranted irrespective of the volume of evidence supporting the factual findings").

ALJ Jonas specifically incorporated by reference the earlier decision that he wrote in May 20, 1998 into his February 16, 2007 opinion. (R. 216). As part of that May 20, 1998 opinion, the ALJ specifically stated in his fourth finding of fact that "[t]he claimant's allegations of disabling symptoms and limitations are not considered fully credible for the reasons set forth in the body of this decision." (R. 28). Of course, an ALJ may not make "a single, conclusory statement" regarding the claimant's credibility (SSR 96-7p), and that was not the case here. ALJ Jonas's reasons for his conclusions covered several pages, including multiple reasons for his conclusions about Plaintiff's credibility. He listed inconsistencies in the Plaintiff's own testimony about his drug and alcohol use with what he reported to medical examiners. (R. 22). He noted that there was "very little pathology" supporting Plaintiff's claims of back pain and "little abnormality" supporting Plaintiff's claims regarding his mental condition. (R. 24). He highlighted the fact that Plaintiff "attempted to minimize his capacity" during examinations, as well as the fact that there was a "lack of a treatment history consistent with alleged complaints." (R. 24-25). He also pointed to inconsistencies in Plaintiff's testimony about whether he was taking medications and Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing." (R. 26).

Furthermore, Magistrate Judge Brown found no fault with the "detailed discussion of [ALJ Jonas's] reasons for finding that Plaintiff's subjective complaints of disabling conditions were not credible." (R. 238). Thus this Court concludes that there is no merit to Plaintiff's argument that ALJ Jonas committed an error of law by not including credibility assessment. The credibility determination was made as required.

Plaintiff argues further that even if the ALJ did make a credibility determination about Plaintiff, the ALJ erred because he "ignored Plaintiff's circumstances regarding access to regular treatment and [minimized] Plaintiff's pain." (Pl.'s Mot. for Summ. J. or Remand at 10). Once made, the assessment of credibility by the ALJ is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). A reviewing court must only determine whether the "ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Plaintiff argues that the ALJ could not cite lack of treatment because Plaintiff reported not having any money for treatment. (Pl.'s Mot. for Summ. J. or Remand at 6 (citing R. 43)). Plaintiff also criticizes the ALJ for "never question[ing] the Plaintiff" about his formal treatment at the 2007 remand hearing yet giving weight to the fact that Plaintiff "has had no formal treatment in several years." *Id*. (citing R. 216). Actually, at the 2007 remand hearing, Dr. Cugell asked Plaintiff if he had had treatment for his back in the last few years, and Plaintiff responded that he had not. (R. 314-315). In his February 16, 2007 opinion, the ALJ's stated, "[a]t the supplemental hearing, claimant related that, although he has had no formal treatment in several years, he treats his back pain with medication he secures from the medical facilities associated with Cook County Hospital." (R. 216).

Plaintiff also argues that the ALJ "ignored the significant evidence as to Plaintiff's pain." (Pl.'s Mot. for Summ. J. or Remand at 7). Plaintiff argues that when there are "'established medical impairments that could reasonably be expected to produce the pain' an ALJ *cannot dismiss* a claimant's subjective complaints." *Id*. (emphasis added) (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). In fact, *Idoranto* stands for the proposition that in "assessing a claimant's credibility, the ALJ must *consider* subjective complaints of pain if the

claimant can establish a medically determined impairment that could reasonably be expected to produce the pain." *Indoranto*, 374 F.3d at 474 (emphasis added); *see also Clifford v. Apfel*, 227 F.3d 863, 871-872 (7th Cir. Ind. 2000) ("the ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings").

Defendant correctly notes that "the administrative law judge was not obliged to believe all [Plaintiff's] testimony. Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." (Def.'s Cross-Mot. for Summ. J. at 6 (citing *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006))). In fact, if Plaintiff's subjective complaints of pain are not fully supported by objective medical evidence, as is the case here, the Seventh Circuit has instructed as follows:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. [The ALJ] must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Clifford*, 227 F.3d at 871-872 (citations omitted). Here, ALJ Jonas obtained information about Plaintiff's daily activities (R. 91, 109-112), Plaintiff's prior work (R. 118-119), and he further relied on the opinions of treating and reviewing medical professionals (R. 115-117, 118-121, 122-129, 130-133, 134-142, 143-149, 150-153, 154-157, 158-165). Thus, ALJ Jonas fulfilled the requirement of considering Plaintiff's subjective complaints of pain in light of all the other evidence in the record, and his determination of the weight to be given to Plaintiff's complaint of pain was accompanied by explanation and support. Therefore the determination will be upheld.

*See Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that the court will declare it to be 'patently wrong' and deserving of reversal.").

## II. The ALJ's Determination Was Supported by Substantial Evidence

Plaintiff argues ALJ Jonas erred by relying (1) on Dr. Cugell, who Plaintiff claims is an unqualified medical expert, and (2) by rejecting Dr. Bianchin's assessment of Plaintiff's RFC in concluding that Plaintiff could lift 100 pounds occasionally and 50 pounds frequently and sit, stand, and/or walk for at least six hours in an eight hour day. Defendant argues that the ALJ reasonably explained why he relied on the opinions of Dr. Cugell and Dr. Gonzalez over the opinion of Dr. Bianchin in coming to his conclusions about Plaintiff's RFC.

A conflict of opinion existed between Dr. Gonzalez and Dr. Bianchin—both of whom filled out assessments of Plaintiff's RFC. Dr. Bianchin concluded in his April 12, 1995 RFC assessment that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, that he could stand and/or walk for about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday, and that he could push and/or pull in an unlimited fashion other than the restrictions mentioned for lift and/or carry. (R. 123). Dr. Bianchin also noted "[a]lthough radiological picture of [illegible] is recognized as 'abnormal'—Clt. [illegible] has findings consistent with limitations imposed by this RFC or better." (R. 128). Dr. Gonzalez, on the other hand, concluded in his October 24, 1996 RFC assessment that Plaintiff had "[n]o functional physical impairments affecting work related activities." (R. 158, 165).

Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence. 20 C.F.R. 404.1527(c); *see also Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) (ALJ did not err in discounting

"cursory" medical evidence that was inconsistent with more recent examination performed by doctor who had been treating claimant for many years).

Citing to Magistrate Judge Brown's opinion of September 11, 2002, Plaintiff asserts that Dr. Bianchin was the only doctor to review the "full medical record." (Pl.'s Mot. for Summ. J. or Remand at 13). Magistrate Judge Brown's opinion stated "… Dr. Bianchin is the only doctor who provided a [RFC] determination after *specifically* reviewing the 1995 x-rays." (R. 244). In fact however, there is no evidence that Dr. Bianchin reviewed the actual x-rays rather than simply the x-ray *report* by Dr. Sanghvi, the only doctor who the record reflects actually reviewed the x-rays. The x-ray itself is not part of the record and was not able to be located by the ALJ, Plaintiff, or Plaintiff's counsel. (R. 314) Additionally, Plaintiff was seen by several psychological and medical examiners *after* Dr. Bianchin's review of the record, including (1) psychologist Dr. Czarnecki, who diagnosed Plaintiff on April 17, 1995 with a Substance Addiction Disorder (R. 134, 139, 140); (2) internist Dr. Guevara, who saw Plaintiff on October 8, 1996 and noted that Plaintiff had no deformity of the spine, no limitation of motion of the spine, and no abnormalities in his range of motion (R. 145); (3) psychologist Dr. Casas, who saw Plaintiff on October 8, 1996 and noted a discrepancy between how Plaintiff walked when he entered his examining room and when he left the appointment (R. 150); and (4) psychiatrist Dr. Lembke, who saw Plaintiff on October 9, 1996 and concluded that Plaintiff had a history of substance abuse and probable dependence (R. 156).

It was after all these appointments that Dr. Gonzalez filled out his RFC assessment for Plaintiff on October 24, 1996. (R. 165). In contrast with Dr. Bianchin's April 12, 1995 RFC assessment from a year and a half earlier (R. 122-129), Dr. Gonzalez made no mention of the

1995 x-rays that showed advanced degenerative disk changes and spondylolisthesis. (R. 124, 128, 165).

ALJ Jonas therefore had Dr. Cugell review the entire record and offer his expert opinion in order to address the discrepancy between the RFC assessments of Dr. Bianchin and Dr. Gonzalez. Dr. Cugell is a doctor specializing in internal medicine and pulmonary disorders at Northwestern Memorial Hospital. (R. 306) In addition to the materials that Dr. Bianchin and Dr. Gonzalez had for their review, Dr. Cugell also had access to additional materials. There was Dr. Brister's mental RFC assessment, in which he concluded that "with abstinence [from drugs and alcohol], there would appear to be no remaining psychopathy to impair [Plaintiff's] ability to do SGA [substantial gainful activity]." (R. 168). There was the disability hearing officer's notes that at the November 22, 1996 hearing Plaintiff "was able to ambulate without difficulty," "his breathing was non-labored," and "[t]here were no noticeable signs of any physical limitations." (R. 70). There was ALJ Jonas's notation from the April 17, 1998 hearing that Plaintiff generally unpersuasive in his appearance and demeanor (R. 26). Additionally, Dr. Cugell had the opportunity to ask questions of the Plaintiff himself at the hearing. (R. 314-317). Moreover, ALJ Jonas specifically asked Dr. Cugell about the possible significance of the x-ray referenced by Dr. Sanghvi. (R. 318). Dr. Cugell concluded that Plaintiff did not evidence physical limitations, regardless of the x-ray results, and that the x-ray results noted by Dr. Sanghvi were common with aging and did not alone indicate limitations. *Id*.

Plaintiff also attacks the ruling of ALJ Jonas by arguing that the notes from Dr. Guevara's medical examination cannot be relied upon by the ALJ to show Plaintiff's actual medical circumstances, because Plaintiff was under the influence of heroin and alcohol at the time of his appointment, which supposedly would have dulled the intensity of his pain. (Pl.'s

Mot. for Summ. J. or Remand at 9). We note first that Plaintiff himself denied being under the influence heroin and alcohol at that appointment when he was questioned about it by ALJ Jonas. (R. 47). Secondly, there is no evidence in the record indicating that Plaintiff would have been able to perform the physical tests for Dr. Guevara better than he actually did had he not been under the influence of heroin or alcohol.

None of these attacks raised by Plaintiff—either individually or collectively—refute the fact that there was a substantial basis for the determination of ALJ Jonas. ALJ Jonas's determination that Plaintiff was not disabled was supported by the evidence from visits with all of the treating doctors, the RFC by Dr. Gonzalez, and the medical opinion of Dr. Cugell. ALJ Jonas's determination to discount Dr. Bianchin's assessment of Plaintiff's RFC is therefore supported by the record. Plaintiff has failed to show that the findings made by ALJ Jonas were not supported by substantial evidence.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [23] is granted and Plaintiff's motion for summary judgment [17] is denied.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: April 16, 2010